FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

98 DEC -9  AM 10: 38

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| KATHY DUDLEY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) CASE NO. CV-97-B-0839-S |
| K-MART CORPORATION and MIKE WILKINSON, | ) ) ) |
| Defendants. | ) ) |

ENTERED
DEC 0 9 1998

## MEMORANDUM OPINION

Currently before the court is the Motion for Summary Judgment of defendants K-mart Corporation ("K-mart") and Mike Wilkinson ("Wilkinson"). Plaintiff Kathy Dudley ("Dudley") brought this action against K-mart, her former employer, and Wilkinson, her former supervisor, alleging that K-mart failed to promote her to the position of processing department manager on three separate occasions because of her race and that both K-mart and Wilkinson retaliated against her and constructively discharged her, all in violation of 42 U.S.C. § 2000e et seq., as amended ("Title VII"), and 42 U.S.C. § 1981.

Both in her pleadings and in oral argument, plaintiff conceded for purposes of summary judgment her claims of retaliation short of her claim for constructive discharge. (*See* Pl.'s Br. in Opp. to Def.'s M. for Sum. J. at 1 n.3). Likewise, plaintiff concedes that her May 1994 promotion claim is untimely and barred by the statute of limitations. (*See id*, n.1). Upon review of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that this motion is due to be granted.

42

## I. FACTUAL SUMMARY

K-mart's Gardendale store is organized into separate departments, each of which is managed by a department manager. (Dudley Dep. at 149). Each department manager reports to the operations manager, who in turn reports to the store manager. (*Id.* at 152-53). Linn Richards occupied the position of store manager from 1993 until he was replaced in June 1995 by Wilkinson. (Richards Aff. ¶ 2). Wilkinson continues to occupy the position of store manager. (Wilkinson Dep. at 6).

Dudley (African-American female) was employed at the Gardendale, Alabama, K-mart store from 1978 until her resignation on October 13, 1997. (Dudley Dep. at 34, 97). During that tenure, plaintiff worked in various departments throughout the store. (*Id.* at 95-97). In 1988, plaintiff began working in the processing department of the store, which was formerly called the receiving department. (*Id.* at 97). Generally, the processing department is responsible for receiving merchandise, documenting receipt of that merchandise and organizing/storing the merchandise on pallets for efficient transfer to the appropriate place on the sales floor or in storage. (*Id.* at 135-37). At the time of plaintiff's resignation in October 1997, four employees worked in the processing department: a manager, an assistant manager, a merchandise claims and control clerk ("MC&C clerk") and a part-time clerk. (*Id.* at 151-52). In addition, stock persons sometimes assisted in the processing department, usually with the unloading of warehouse trucks. (Chappell Aff. ¶ 3).

Plaintiff worked as the processing clerk for approximately three to four years, until she was promoted to the MC&C clerk, where she was primarily responsible for processing and returning damaged/defective goods. (Wilkinson Dep. at 160-63). In May 1994, the position of

2

processing department manager became vacant and Linn Richards, the former store manager, selected Patty Cosby (white female) to assume that position for a trial period of 60 days. (Richards Aff. ¶ 5). In July 1994, at or around the same time that Cosby was officially promoted, plaintiff was removed from the MC&C position.[1] (Richards Aff. ¶ 8). In December 1994, Richards created the new position of assistant manager of the processing department and promoted plaintiff to that position. (Richards Aff. ¶ 9). Plaintiff remained the assistant manager of the processing department until she resigned in October 1997. (*Id.* at 97).

Wilkinson became the store manager in June 1995. (Wilkinson Dep. at 6). Over a year later, in October 1996, the processing manager position became available. (*Id.* at 129). Wilkinson considered plaintiff (the assistant manager), Tammi Wren (the MC&C Clerk) ("Wren") and Joan Gray (the Garden Shop Manager) for the vacancy. (*Id.* at 131-33). Wilkinson testified that he selected Wren (white female) because Wren 1) was very productive, fast and precise in her work, 2) was cooperative and flexible, 3) communicated well, 4) could recognize problems and took initiative in her job, 5) exhibited good technical skills, 6) could perform the MC&C job, 7) "had a very good work record, proven track record", 8) was a team player and 9) was dependable and took pride in her work. (*Id.* at 145-148). In contrast, Wilkinson found that plaintiff "was an average employee. That she was slow, however, steady, productive. She was not a good communicator, she didn't speak, she didn't talk a lot, she didn't communicate a lot. She had

---

[1] The reasons underlying plaintiff's transfer out of that position are in dispute. Richards states that plaintiff was struggling in the MC&C position, that she was "overwhelmed by the position" and chronically behind in her work, and that he removed her on that basis. (Richards Aff. ¶ 4, 5, 8). Plaintiff contends that is not the case, but admits that she had difficulty doing the MC&C job and that she got behind while performing that position. (Dudley Dep. at 117-118). This dispute is not material to the issues before the court.

problems in other areas, and that . . . she would probably not be the best choice." (*Id.* at 141).

According to Wilkinson, plaintiff rarely spoke to others and appeared to have difficulty directing or delegating. (Wilkinson Dep. at 183-187, 204-217). Wilkinson perceived plaintiff as "task-oriented", one who would stay busy accomplishing a discrete task rather than delegating or directing others. (*Id.* at 261-263). Wilkinson also observed deficiencies in plaintiff's planning skills. For example, when plaintiff unloaded merchandise, it often had to be moved two or three times instead of once because plaintiff would fail to formulate a storage plan. (*Id.* at 246). Wilkinson also observed that plaintiff often failed to put seasonal merchandise on pallets and blocked-in needed merchandise. (*Id.* at 251).

Plaintiff disputes Wilkinson's characterization of her deficiencies. Wilkinson testified that he believed plaintiff to be slower than average checking in freight. (*Id.* at 196). However, Wilkinson admitted that there was no appreciable difference in the speed in which the plaintiff and the former manager checked in freight. (*Id.* at 198). Plaintiff also disagrees with Wilkinson's criticism of her communication skills. She claims that Wilkinson would ignore her when she spoke to him. (Dudley Dep. at 385). As for Wilkinson's criticism that plaintiff had trouble directing or delegating, she testified that Wilkinson told her that she did not have the authority to make anyone else do her work. (Dudley Aff. ¶ 5). While plaintiff admits she did not report to the appropriate manager one day when she left work, she claims that she was erroneously told that she only had to report to the department manager and apologized and never repeated the mistake again. (Dudley Aff. ¶ 13).

Dudley asserts that criticism of her planning and managerial skills were also unwarranted. As evidence of plaintiff's poor planning skills, Wilkinson points to the fact that merchandise had

to be moved three or four times when it was unloaded. (Wilkinson Dep. at 246-51). Plaintiff stated that her job was to check in and unload freight, not to plan where to put the freight. (Dudley Aff. ¶ 5). In addition, Dudley claimed that although freight was occasionally blocked in, this was unavoidable. (Dudley Aff. ¶ 18).

Four months after she was hired as processing manager, Wren quit. (Wren Dep. at 63). Wilkinson selected Libby Totten ("Totten") (white female) to replace Wren as manager. (Totten Aff. ¶ 4). Totten remained the processing department manager throughout the remainder of plaintiff's employment with K-mart. (*Id.*). According to Wilkinson, plaintiff was not considered in the selection process because she had not demonstrated any improvement with respect to her job performance since the last promotion decision several months earlier. (Wilkinson Dep. at 316). Wilkinson testified that plaintiff continued to exhibit the same performance deficiencies discussed in relation to the last promotional opportunity. (*Id.*).

At the time of the decision, Totten occupied the position of DIY (Do-It-Yourself) department manager. (*Id.* at 320-21). Totten, who had experience managing several departments throughout K-mart, was insisting that she be transferred to a management position off the sales floor. (Totten Affid. ¶ 3). The evidence also reflects that Totten's supervisor informed Wilkinson that Totten was burned out in her position and wanted a transfer to another position off the floor. (Wilkinson Dep. at 321) Wilkinson testified that there were no suitable openings in the office or elsewhere for Totten at the time of her request. (*Id.* at 321-22).

In addition to plaintiff's lack of improvement and the need to transfer Totten to another management position, Wilkinson testified that Totten was selected for the processing manager vacancy because of her superior management experience. (Wilkinson Dep. at 350). Specifically,

5

Wilkinson testified, "I was more interested in someone that had good management skills or that I thought would be a good, . . . [and] had exhibited those characteristics that would make a good manager..." *Id.* He was also concerned about losing a seasoned manger if Totten was not accommodated. (*Id.*). During her employment with K-mart, Totten had served as manager over several departments. (Totten Aff. ¶ 2). Totten had recently served as the Unit & Pricing Manager, wherein she was responsible for supervising all of the department managers. *Id.*

At the time of plaintiff's resignation, there were only two daytime stock persons. (Dudley Dep. at 586-88). While they sometimes helped in the processing department, they were shared by approximately fourteen departments. *Id.* Their availability to assist in the processing department was therefore dependant upon whether they were already assisting in or needed by another department. (*Id.* at 590-91). According to Bobbie Taylor, the processing clerk, "If a stockman was available, he usually helped us unload the trucks. Sometimes we unloaded it without a stockman (or the help of anyone else) and sometimes a stockman would help us. It simply depended upon his availability. In fact, throughout the time I worked there [several years] we often had to unload the trucks by ourselves." (Taylor Aff. ¶ 8).

According to plaintiff, Wilkinson directed employees not to help her in retaliation for her filing of an EEOC complaint. (Dudley Dep. at 593-95). In support of this claim, plaintiff states that on "several occasions" near the end of her employment when she asked for assistance from the stock persons, they were unavailable to help her. (*Id.*). However, according to one stock person, Jeremy Chappell, there was never an occasion where he refused or failed to assist the processing department when he was not busy helping another department. (Chappell Aff. ¶ 6). Chappell states that his level of assistance in the processing department remained constant

throughout the last few years prior to plaintiff's resignation. (*Id.*).

On Monday, October 13, 1997, several warehouse trucks arrived soon after Totten and plaintiff began their shift. (Totten Aff. ¶ 8). Totten contacted the acting manager on duty, Michael Sims ("Sims"), the Hardlines Manager, requesting some assistance from the stock persons. (Totten Aff. ¶ 9). Sims explained that a stock person had not yet arrived but once he did, he would be sent back to assist. (*Id.*). When no assistance came to the processing department by 8:00 a.m., Totten and plaintiff walked off their jobs. (Dudley Dep. at 483-86).

## II. SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; *See* Fed. R. Civ. P. 56(a) and (b). Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . .affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)(citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. DISCUSSION

#### A. Discriminatory Failure to Promote Claims

Dudley claims that the defendants discriminated against her in violation of Title VII and Section 1981.[2] A plaintiff alleging illegal discrimination under Title VII may establish a genuine dispute as to his claim in three ways: 1) by presenting direct evidence of discriminatory intent,[3] *see Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998); 2) by meeting the three-step test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973);

---

[2] Since the legal elements of a disparate treatment claim predicated upon Title VII and Section 1981 are identical, this court need not discuss plaintiff's Title VII claim separately from her Section 1981 claim. *See Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985).

[3] "Direct evidence is '[e]vidence which if believed, proves existence of fact in issue *without inference or presumption.*'" *Rollins v. Techsouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987). Plaintiff has not presented any direct evidence of discrimination.

8

or 3) by demonstrating through statistics a pattern of discrimination,[4] *See Carter, supra,* at 642 n.5 (citing *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1131 (11th Cir. 1984)).

Because Dudley relies on circumstantial evidence, the court will evaluate her case under the framework established in *McDonnell Douglas.* Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997). The burden of production then shifts to the employer, who must respond with a legitimate, nondiscriminatory reason for its actions. *Id.* at 1528. Once the employer satisfies its burden of production, the plaintiff, in order to prevail, must establish that the employer's articulated legitimate, nondiscriminatory reason was pretextual and that the unlawful discrimination was in fact the cause of the adverse employment action. *Id.* at 1528-29. Despite the burden shifts in the *McDonnell Douglas* test, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253 (1981); *accord Evans v. McClain of Georgia, Inc.,* 131 F.3d 957, 963 (11th Cir. 1997).

### 1. The October 1996 Promotion Decision

In order to demonstrate a prima facie case for discriminatory failure to promote, a plaintiff must show that: 1) she is a member of a protected class; 2) she was qualified for and applied for the promotion; 3) she was rejected in spite of her qualifications; and 4) the individual who received the promotion is not in a protected group and had lesser or equal qualifications. *Carter,*

---

[4] Since plaintiff has not attempted to prove a pattern of discrimination through the use of statistics, the court need not address this method.

132 F.3d at 642. It is undisputed that plaintiff is a member of a protected group (African-American) and defendant does not dispute that plaintiff applied for and was refused the position of processing center department manager.[5] In addition, as a long-time employee of K-mart and assistant manager of processing, Dudley was arguably as qualified as Wren and was rejected in spite of these qualifications. Thus, Dudley has satisfied her prima facie case.

K-Mart has produced legitimate non-discriminatory reasons for its decision to promote Wren instead of Dudley. Wilkinson, the store manager who promoted Wren in October 1996, selected Wren because Wren 1) was very productive, fast and precise in her work, 2) was cooperative and flexible, 3) communicated well, 4) could recognize problems and took initiative in her job, 5) exhibited good technical skills, 6) could perform the MC&C job, 7) "had a very good work record, proven track record", 8) was a team player and 9) was dependable and took pride in her work. (Wilkinson Dep. at 145-148). In contrast, Wilkinson found that plaintiff "was an average employee. She was slow, however, steady, productive. She was not a good communicator, she didn't speak, she didn't talk a lot, she didn't communicate a lot. She had problems in other areas, and that . . . she would probably not be the best choice." (Wilkinson Dep. at 141).

In order to establish pretext, plaintiff attempts to refute K-mart's proffered reasons for its decision. Plaintiff does not dispute Wilkinson's characterization of Wren's good qualities. Rather, Dudley attempts to refute the defendants' characterization of her as a merely average employee with a number of flaws. Plaintiff put forth evidence to demonstrate that she was not slow in checking in freight as Wilkinson had alleged. Furthermore, Dudley testified in detail that

---

[5] The record reflects there was no formal process for applying for a vacant position.

her communications skills were not lacking. Plaintiff also asserted that Wilkinson was erroneous in his claim that she had poor management skills. Wilkinson testified that plaintiff was not task oriented because she did not delegate her manual labor duties. Dudley countered that she had no one to whom to delegate these duties. Plaintiff disputes all of the alleged examples of poor work performance put forth by Wilkinson and gives explanations for each of these alleged deficiencies and instances. Dudley also claims to have all of the good qualities which Wilkinson attributed to Wren.

While Dudley disputed all of Wilkinson's proffered reasons for his promotion of Wren instead of her, she put forth no further evidence that Wilkinson acted with a discriminatory motive. Plaintiff has put forth no evidence to show that Wilkinson did not in fact genuinely believe that Wren was the better qualified candidate. Rather, this court is asked to infer that since Dudley was allegedly more qualified and was passed over for a promotion, Wilkinson discriminated against plaintiff on the basis of her race. Even assuming that Dudley was the most qualified person for the position of receiving department manager, this does not of itself refute the testimony of Wilkinson that race played no role in his decision. *See McCarthney v. Griffin-Spalding County Bd. of Educ.*, 791 F.2d 1549, 1552 (11th Cir. 1986) ("[e]ven assuming that the evidence demonstrated [plaintiff] was the most qualified person for the available positions, this does not of itself refute Dr. Green's testimony that [plaintiff's] gender played no role in his decision."). "Title VII does not require an employer to hire or promote the most qualified applicant; it only requires that the employer make such decisions without regard to race, sex, religion, color, or national origin." *Id.* When one views this case in the light most favorable to the plaintiff and construes all doubts in her favor, the only evidence of discrimination presented by

11

the plaintiff is that she was better qualified than Wren, and was not chosen for the promotion. Although the failure to promote the most qualified applicant may be circumstantial evidence of discrimination, standing alone, it is not sufficient evidence to cause a reasonable jury to disbelieve Wilkinson's testimony that race played no part in his decision. Therefore, summary judgment on plaintiff's claim of failure to promote the plaintiff in October 1996 is due to be granted.

### 2. The February 1997 Promotion Decision

Plaintiff also alleges that Wilkinson's decision to promote Totten, instead of her, in February 1997, was discriminatory. Dudley has established a prima facie case of discriminatory failure to promote in this instance as well.[6] It is undisputed that plaintiff is a member of a protected group (African-American) and defendant does not dispute that plaintiff applied for and was refused the position of processing center department manager.[7] In addition, as a long-time employee of K-mart and assistant manger of processing, Dudley was arguably as qualified as Totten for the position and was rejected in spite of these qualifications.

Defendants have produced legitimate nondiscriminatory reasons for the promotion of Totten instead of Dudley. The record reflects essentially three reasons why Totten was selected instead of plaintiff for the processing center manager position (1) Totten, a long-term management employee, had requested a lateral transfer to another department and implied she

---

[6] As previously stated, in order to demonstrate a prima facie case for discriminatory failure to promote, a plaintiff must show that 1) she is a member of a protected class; 2) she was qualified for and applied for the promotion; 3) she was rejected in spite of her qualifications; and 4) the individual who received the promotion is not in a protected group and had lesser or equal qualifications. *Carter*, 132 F.3d at 642.

[7] As previously noted, the record reflects there was no formal process for applying for a vacant position.

12

would resign if she was not afforded a transfer; (2) plaintiff had not improved her job performance since the last promotion decision, and (3) Totten had far superior management experience at K-mart.

Dudley claims that these explanations are pretext for discrimination based on race. Plaintiff argues that supervisory experience was not a true reason or factor for selecting Totten because "Wilkinson ranked all the department manager positions in the store in order of the importance of prior experience in the department when it comes to filling the position" and ranked the processing department third in the store, behind human resources and office manager. (Pl.'s Br. in Opp. to Sum. J. at 23). Because she had prior experience in the processing department and Totten did not, Dudley claims that she was the most qualified person for the position. In further support of this proposition, plaintiff re-asserts her disagreement with the evaluation of her job performance made by Wilkinson. Dudley also cites her positive qualities which allegedly demonstrate her qualifications for this job.

Other than plaintiff's subjective opinion that she was qualified to run the department and that her job skills were sufficient, plaintiff does not present any evidence that Wilkinson acted with a discriminatory motive. Plaintiff has put forth no evidence to show that Wilkinson did not in fact genuinely believe that Totten was the better qualified candidate. Rather, this court is asked to infer that since Dudley was allegedly more qualified and was passed over for a promotion, Wilkinson discriminated against Dudley on the basis of her race. "Title VII does not require an employer to hire or promote the most qualified applicant; it only requires that the employer make such decisions without regard to race, sex, religion, color, or national origin." *McCarthney*, 791 F.2d at 1552. Although the failure to promote the most qualified applicant may be circumstantial

evidence of discrimination, standing alone it does not refute Wilkinson's testimony that race played no part in his decision. Dudley's own opinions about her qualifications are not enough to cause a reasonable jury to disbelieve defendants' stated nondiscriminatory reasons for the decision. *See id* ("[e]ven assuming that the evidence demonstrated [plaintiff] was the most qualified person for the available positions, this does not of itself refute Dr. Green's testimony that [plaintiff's] gender played no role in his decision."). Plaintiff has failed to present sufficient evidence to allow a reasonable fact finder to disbelieve Wilkinson's proffered explanation for selecting Totten for the February 1996 promotion. Therefore, summary judgment on plaintiff's claim of failure to promote the plaintiff in February 1996 is due to be granted.

### B. Constructive Discharge Claim

Both in her pleadings and in oral argument, plaintiff withdrew or conceded, for purposes of summary judgment, her claims of retaliation short of her claim for constructive discharge. The law in this circuit is well established with regard to constructive discharge. In order to establish that she was constructively discharged, the plaintiff employee must prove that defendant created working conditions so intolerable that a reasonable person in the employee's shoes would have felt compelled to resign. *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1996); *Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir. 1991).

Plaintiff's claim that she was constructively discharged rests on her allegation that assistance, which had previously been provided to her in accomplishing her job duties, was withdrawn in retaliation for her filing of an EEOC complaint. Specifically, plaintiff claims that in the months preceding her resignation, stock boys were purposely restricted from assisting her with tasks such as the unloading of warehouse trucks. Plaintiff also contends that Wilkinson

14

created an intimidating environment for her by totally ignoring her at work. However, assuming all of the plaintiff's allegations are true, these actions do not rise to the level of intolerable working conditions so as to compel a reasonable person in the plaintiff's shoes to resign. *See Wardwell v. School Bd. of Palm Beach County, Florida*, 786 F.2d 1554, 1558 (11th Cir. 1986) (holding in part that an increase in duties cannot constitute the intolerable working conditions necessary to prove a constructive discharge). No reasonable fact finder could find that plaintiff was constructively discharged. Thus, summary judgment on plaintiff's constructive discharge claim is due to be granted.

## CONCLUSION

Plaintiff's evidence raises no genuine issue of material fact regarding her claims of race discrimination and constructive discharge. Accordingly, defendants' motion for summary judgment with respect to these claims is due to be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 9th day of December, 1998.

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge